Filed 7/22/21  In re Sophia B. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re Sophia B., a Person Coming Under Juvenile Court Law. | B308613 |
| ———————————————— LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP00170B) |
| Plaintiff and Respondent, | |
| v. | |
| F.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

————————————————

### INTRODUCTION

Father appeals from the jurisdictional findings pursuant to Welfare and Institutions Code section 300, subdivision (b)(1), and a dispositional order declaring his daughter a dependent and removing her from his custody.[1]  He argues there was insufficient evidence that daughter had suffered or was at risk of suffering physical harm.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Father and mother have two children, daughter (born 2008) and son (born 2003).  The parents separated in 2005 and were granted joint custody of the children in 2011.  These dependency proceedings involve only daughter.

**1.    *Father's Emotional Abuse of Daughter***

In September 2019, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging daughter was feeling down and having panic attacks because father was yelling at her, and telling her she was worthless and ugly.  The parents had joint custody of the children:  father had the children on Mondays, Tuesdays, and every other weekend. DCFS cross-reported the allegations to law enforcement and a police officer interviewed the children.  Daughter told the officer that father had a short temper, was often angry, and would yell at her and bang his hands against the wall and a table. Daughter said father became angry "nearly every day."  Daughter denied being physically abused but said she was afraid of father and did not like going to his house.  Son, who was 16 at the time, told the officer father had a short temper and was often angry, but denied that he or daughter had been physically abused.

---

[1]     All subsequent statutory references are to the Welfare and Institutions Code.

2

Based on the officers' interviews, law enforcement took no further action.

DCFS interviewed mother and the children in late October 2019. Mother stated daughter had told her that father lost control with daughter, yelled at her, and called her ugly, dumb, and a piece of shit. Daughter had reported that father shook daughter awake late at night and told her to do chores. Mother noted daughter experienced anxiety attacks over having to visit father and once wanted to run away from father's home. Daughter had described a dream to mother where daughter was holding a knife, mother was telling her "not to do it," and she told mother that father would be better off if daughter did not exist. Mother had tried to keep daughter from having to visit father on three occasions but each time law enforcement came to the house and forced the visit to occur against daughter's wishes. Mother told DCFS that daughter was receiving counseling services through school. Mother explained that father did not know about the counseling because father would not consent to daughter receiving such services because he feared daughter would be labeled "crazy" and would not be able to get into college.

Son told the social worker daughter was scared of father. He said father yelled at daughter, got mad for the "dumbest reasons," and needed anger management because he had "a bit of a temper" and could be "kind of scary" when angry. Son denied hearing father call daughter ugly but noted father may have said she was worthless when she would get a low grade in school.

Daughter told DCFS: "My dad, every day, comes at me. He calls me bad words. He tells me I disrespect him when I don't say anything. I'm scared of my dad. I don't do anything. He gets mad for the smallest things. It's scary. I feel like, 'why is he

yelling at me?  I didn't do anything.'  Every day he tells me I did something wrong or he yells at me."  Daughter said father called her stupid, ugly, worthless, and shit, and told her she would accomplish nothing in life.  Daughter experienced anxiety attacks over having to visit father and had thought about running away when she was eight years old.  She described visits with father as "long[,] scary days" because he would always yell at her, she was always in trouble, she did not feel safe, and she was scared of him.  She said she did not want to visit father anymore.  Daughter told DCFS that she had a recurring dream where she went to the kitchen, grabbed a knife, dropped it on the floor, fell to her knees, and began crying.  The dream made her feel like "everything would be better if I wasn't there."

DCFS interviewed the therapist at daughter's school.  The therapist opined that father emotionally abused daughter.  The therapist reported daughter stated that on one occasion father became so mad at daughter that he threw her cellphone against the wall, picked it up, and threw it against the wall again.

DCFS interviewed father at his home on December 5, 2019.  The social worker noted the home was very clean, and had three fully-stocked refrigerators and a suitable room for daughter.  Father denied calling daughter ugly or mistreating her in any manner, and said he would do anything to ensure she was healthy and happy.  The social worker noted father appeared to be a loving parent who was fully invested in the well-being of his children.

DCFS re-interviewed mother and the children on December 5, 2019.  Son said he felt safe in father's home and was not afraid of him.  Mother stated things must have improved with

4

daughter because the child was not as stressed or anxious, and complained less about father.

Daughter nonetheless told DCFS things with father continued to be "rough" and were going to get worse. When asked how she knew things would get worse, she answered, "I just know." Daughter admitted to having thoughts of hurting herself, although only in dreams. When asked to elaborate, she reiterated that she was having recurring dreams of dropping a large kitchen knife on the kitchen floor and breaking down in tears. She added that she was afraid of father because he had hit son two years ago. She then said father had only pushed son.

On January 5, 2020, DCFS interviewed mother and the children again. Mother disclosed that there had been domestic violence between herself and father in the past, including an incident in 2007. Son stated father would raise his voice with daughter but denied hearing him call her names.

Daughter said things with father were the same: he still yelled at her and spoke to her in a negative manner. She repeated that she was afraid of father, did not want to visit him, was having dreams where she thought of harming herself, and had considered running away but did not have a plan or think she would follow through. Daughter added that sometimes when father was yelling she would think to herself, "I just want to die, I['d] rather not be here." She then stated she had "not actually thought of doing it, it's more of a I don't want to be there with him in that moment because he is being mean to me."

## 2.    *Petition and Detention*

On January 14, 2020, DCFS filed a petition pursuant to section 300 subdivisions (b)(1), (c), and (j), alleging the children were at risk of physical and emotional harm due to father's

5

treatment of daughter. The juvenile court detained the children from father, released them to mother, granted father monitored visits, and ordered that no one was to discuss the petition's allegations with daughter.

### 3. *Daughter's Relationship with Father Improved During Monitored Visitation*

When DCFS re-interviewed the family in February 2020, daughter said she wanted to visit father more often. Daughter stated, "I feel comfortable visiting my dad with my grandma. We go shopping and to restaurants to eat. I will be fine visiting my dad at his home." Mother noted daughter missed father and wanted to visit him, even though daughter was still anxious about her issues with father and was reluctant to discuss them with father.

Father denied ever putting his hands on daughter and said he was always affectionate and telling her how much he loved her. He acknowledged he may have raised his voice when daughter told him she was not going to participate in sports, but that was because he wanted to emphasize the importance of extracurricular activities. He also acknowledged using language like "shit," but denied calling daughter that directly and explained he had used that word to describe daughter's messy bedroom.

The paternal grandmother told the social worker father had a "strong personality." She also said, "He may be bothered instantly but he will calm down equally as instant. He is able to calm down. His reaction might be quick but he's not abusive."

In reports dated July 7 and October 8, 2020, DCFS noted father had recently completed a parenting class and provided a form dated February 4, 2020 from the Department of Mental

Health indicating (1) it had reviewed the results of father's mental health assessment, and (2) father's mental health condition did not cause problems for him in his daily life that were serious enough to make him eligible for specialty mental health services from his mental health plan.

Daughter was participating in therapy, had been visiting father without incident, and said she wanted to visit him more frequently. Father told DCFS he wanted to participate in counseling with daughter.

### 4. *Adjudication and Disposition*

At the October 22, 2020 hearing, counsel for daughter argued father's behavior subjected daughter to emotional harm but that the juvenile court should take jurisdiction under subdivision (b)(1) of section 300 instead of subdivision (c) or (j).[2] Counsel requested that jurisdiction be sustained under [subdivision] (b)(1) because "[subdivision] (c) . . . places more of the issue on the child. And I think the issue here . . . can be remedied by the father acknowledging that there is a problem in how he is interacting with" the children. Counsel asserted that father was controlling and verbally abusive to daughter. Counsel stated that father's perception of how his children felt and

---

[2] Section 300, subdivision (b)(1) provides for jurisdiction over the child where there is a substantial risk the child will suffer serious harm because of the parent's inability or failure to supervise or protect the child. For the court to take jurisdiction under section 300, subdivision (c), the child must be suffering or be at substantial risk of suffering serious emotional damage due to the parent's conduct or inability to provide care. Subdivision (j) allows the juvenile court to take jurisdiction where the child's sibling has been abused or neglected and there is a substantial risk that the child will be abused or neglected.

7

experienced life in his home differed from their reality. She argued that without conjoint counseling and continued services, her client would be at risk of harm.

Counsel for father argued the petition should be dismissed. The attorney stated father had denied and continued to deny many of the statements attributed to him in the DCFS's reports. Counsel argued that if credited, daughter's statements indicated that the conflict between daughter and father began only recently and as a result of father holding daughter to high standards. Counsel asserted that daughter's statements are "not indicative of an ongoing regular pattern of verbal abuse." Counsel argued that there is no indication father intentionally harmed daughter.

DCFS asserted that father failed to acknowledge his problematic conduct. DCFS explained that daughter recently began to feel better only because DCFS became involved and stopped father's abuse. DCFS asked the court to sustain the petition and not to dismiss the subdivision (c) count, noting daughter's suicidal ideation.

The juvenile court found daughter had "exhibited emotional distress in various forms" and was "credible in describing the comments that were made." The court stated that these were "not the kind of comments that a child of that age should have to endure," and "[t]his kind of language leave[s] its scars." Noting father's parenting classes, the court stated: "it looks like there is beginning to get some traction toward resolving some of these issues. That is not to say that they are resolved. Father has a long way to go."

The court dismissed the counts pled under subdivisions (c) and (j), found daughter was at risk of serious physical harm pursuant to subdivision (b)(1), and sustained the supporting facts

as follows: "b-1: The child, [daughter], exhibited emotional distress from [father] repeatedly and on an ongoing basis calling the child derogatory, demeaning and degrading names[,] which [has] resulted in the child being afraid of father and demonstrating other manifestations of emotional harm." The court explained, "I think this [] better framed as a [subdivision] (b)[(1)], where the focus is on father's conduct and its impact on the minor. I have not seen that it has resulted in the severe emotional distress that has been talked about and the severe risk." The court stated father "needs to recognize [work] needs to be done on his side as well, and not just helping to heal this child, but also to ensure that he is taking control of this. I think that it is fairly clear that without that progress on his side, the risk would exist there."

The court then proceeded to disposition. Father objected to daughter's continued detention and requested that individual counseling not be ordered for him. The court declared daughter a dependent, removed her from father's custody, placed her with mother, ordered monitored visits for father, and directed the DCFS to refer the family to services, including individual counseling for father. Counsel for father objected to the order for individual counseling. The juvenile court responded that it was necessary because "father's attitude is 'my daughter has a problem. I want to help resolve it.' As if he is not a part of that."

### DISCUSSION

Father argues that there was insufficient evidence to support the court's jurisdictional finding under section 300, subdivision (b)(1), and that daughter was wrongly removed from his custody.

9

1.    ***Substantial Evidence Supports Jurisdiction***

Section 300, subdivision (b)(1) provides, in pertinent part, that a child may be declared dependent if "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ." (§ 300, subd. (b)(1).) "A jurisdictional finding under section 300, subdivision (b)(1), requires [the agency] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence. We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. However, substantial evidence is not synonymous with any evidence. . . . [W]hile substantial evidence may consist of inferences, such inferences must be a product of logic and reason and must rest on the evidence; inferences that are the result of mere speculation or conjecture cannot support a finding." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763, internal quotation marks and citations omitted.)

Here, daughter disclosed that in her dreams, she was having thoughts of hurting herself with a knife. The nightmares

10

made her feel like "everything would be better if I wasn't there." When father yelled at her, daughter thought to herself, "I just want to die, I['d] rather not be here." Daughter also thought father would be better off if she did not exist. Substantial evidence supported the trial court's findings that daughter's suicidal ideations were caused by the emotional abuse daughter suffered from her interactions with father, and that she was at risk of physical harm, even if it were self-inflicted. Daughter was afraid of father, she had anxiety attacks anticipating interactions with him, and had thought about running away from his home.

After DCFS intervened and the suicidal ideations were brought to his attention, father treated the problem as one that daughter needed to address, denying his own role in causing daughter emotional distress. Father in fact never acknowledged that he created an emotionally damaging environment for daughter. The evidence supported the juvenile court's conclusion that daughter was at risk of suffering serious physical harm from self-harm in father's care because of father's failure to address these issues.

Father likens this case to *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379–1382 (*Brison C.*). In *Brison C.*, the Court of Appeal held that substantial evidence did not support jurisdictional findings under section 300, subdivision (c). (*Brison C., supra*, 81 Cal.App.4th at p. 1376.) The child there was caught in the middle of an ongoing custody battle between his parents. The Court of Appeal concluded: "The evidence shows only that [the child], an otherwise reasonably well-adjusted child who performed well at school and displayed no serious behavioral problems, despised his father and desperately sought to avoid visiting him." (*Ibid.*) The court also concluded there was no

11

evidence that he was at substantial risk of suffering serious emotional damage since "[b]oth parents have recognized the inappropriateness of their past behavior and of commenting to [the child] about the other. They have expressed a willingness to change their behavior patterns and to attend counseling and parenting classes." (*Id.* at p. 1381.) The court found there was no evidence the parents were "incapable of expressing their frustration with each other in an appropriate manner." (*Ibid.*)

Brison C. is distinguishable. Unlike the *Brison C.* parents, father has refused to acknowledge his destructive behavior or express a willingness to change it. He frames the situation as entirely daughter's problem. We, like other courts, also question the soundness of the *Brison C.* court's conclusion regarding the child's well-being given the child's fear of his father, nightmares, and suicidal ideation if forced to visit or live with him. (*Brison C., supra,* 81 Cal.App.4th at p. 1377; see *In re A.J.* (2011) 197 Cal.App.4th 1095, 1105 [questioning "the soundness of the *Brison C.* court's conclusion the minor displayed no signs of serious emotional damage"]; *In re D.B.* (2020) 48 Cal.App.5th 613, 624 [same].)

## 2.     *Substantial Evidence Supports Removal*

We review whether there was substantial evidence to support the court's removal order under the heightened standard of review set by our Supreme Court. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) When "presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could

have made the finding of high probability demanded by this standard of proof." (*Ibid.*)

Once the juvenile court determines that the child is described under section 300, it may issue an order at the dispositional hearing removing the child from parental custody pursuant to section 361. The court may only remove the child if there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

" 'The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]' " (*In re J.S.* (2014) 228 Cal.App.4th 1483, 1492, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4; see *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "In making its disposition orders the court has broad discretion to resolve issues regarding the custody and control of the child, including deciding where the child will live while under the court's supervision." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 346.)

Father argues there was no evidence of any physical abuse of daughter, and insufficient evidence of a substantial danger to her physical health and safety, or emotional well-being. He also asserts that the juvenile court had alternatives to daughter's removal, i.e., keeping father under "very strict supervision and on contingency that he continue[s] to take the teen to counseling

13

appointments." He also asserts "the court could have ordered in-home services."

We find the removal order was founded on substantial evidence. The record affirmatively supported the trial court's finding that removal was necessary to protect daughter from harming herself. Father's emotional abuse of daughter was the impetus for daughter's suicidal ideations. Her relationship with father and her mental health improved only when she was removed from his custody. The trial court reasonably found that returning daughter to father's custody before father engaged in significant reunification services would jeopardize daughter's physical well-being.

## DISPOSITION

The court's jurisdictional finding and dispositional order are affirmed.


                                            RUBIN, P. J.

I CONCUR:


        MOOR, J.

14

In re Sophia B.
B308613


BAKER, J., Dissenting


The juvenile court dismissed the allegation, pursuant to Welfare and Institutions Code section 300, subdivision (c), that minor Sophia B. is at substantial risk of suffering serious emotional damage (as evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior) as a result of her father's conduct. The Los Angeles County Department of Children and Family Services does not cross-appeal from that dismissal. Thus, the only question before us for decision is whether there is substantial evidence Sophia B. was at substantial risk of suffering serious physical harm. (Welf. & Inst. Code, § 300, subd. (b)(1).) In my view, there is not. There is certainly evidence that the child suffered emotional damage from her father's verbally abusive conduct, but I do not believe this rises to the level of a substantial risk of serious physical harm.


BAKER, J.