Filed 8/23/24  In re A.M. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.M., et al., Persons Coming Under Juvenile Court Law. | B326476 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22CCJP00389A-C, E) |
| Plaintiff and Respondent, | |
| v. | |
| M.M., | |
| Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County, Cathy Ostiller, Judge.  Dismissed in part, affirmed in part, and reversed in part.

        Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

M.M. (father) appeals from the juvenile court's detention orders, and its dispositional orders removing his children from his custody and requiring him to participate in anger management classes. We dismiss the appeal as to the detention orders as moot and affirm the dispositional orders removing the children. Because the juvenile court did not properly exercise its discretion when it ordered father to attend anger management at the disposition hearing, we reverse that aspect of the order.

**FACTS AND PROCEDURAL BACKGROUND**

**I.       Facts**

Mother and father are from Guatemala, where they met before moving to the United States in 2006. They have been married since 2017, and speak only Spanish. They have four children together, Angel (born April 2008), Ashley (born October 2011), Angela (born July 2015), and Sharon (born August 2022). Mother has one other child, Marvin (April 2021), who father thought was his son until mother called that into doubt, and a DNA test revealed he was not.[1]

Mother is not employed, and father drives for ridesharing services. Neither parent physically disciplines the children. Mother has no criminal history, and father's criminal history

---

[1]      Because father does not challenge any orders as they relate to Marvin M., we dismiss the appeal insofar as it concerns this child.

includes a DUI and driving without a license in 2008 and 2009. Father has not drank alcohol since 2009.

In 2007, father and mother got into an argument at a family party, and father pushed mother, grabbed her hand, and hurt her finger.

Thirteen years later, in April 2020, father and mother got into an argument in the car, and father slapped her with the back of his hand in front of the children.

In August 2021, father struck mother's face with an open hand in the children's presence while the family was in Las Vegas.

In October 2021, mother was hospitalized for several days because she had a psychotic episode and believed someone was threatening to kill her. Mother was diagnosed with "psychotic disorder," that was "[m]ild" and "[r]esolving," and was prescribed a daily medication. Mother missed her follow-up mental health appointment in November, and also missed the rescheduled appointment in December.

Also in October 2021, the family came to the attention of the Los Angeles Department of Children and Family Services (Department) after someone had received a report from mother that father had hit her three to four times in the children's presence.

In November 2021, mother told father she had been involved in extramarital affairs and may be pregnant. Father became doubtful as to whether he was Marvin's biological father and requested a DNA test. The same month, mother and father got into an argument during which father dragged mother out of the bathroom and threw her on the floor in the children's

presence. In another incident, on the family's drive home from the beach, father slapped mother with an open hand on the chest.

On November 24, 2021, father reported being "willing to leave the home due to the ongoing disputes with mother." The same day, mother reported that she would like to separate from father, but that she has nowhere to go. The Department "provided mother with a resource packet and marked domestic violence shelters" for mother and children. Angel, Ashley, and Angela all reported feeling safe at home with their parents.

## II. Procedural Background

### A. Section 300 petition

On January 31, 2022, the Department filed a petition under Welfare and Institutions Code section 300,[2] subdivisions (a) and (b), based on mother and father's "history of engaging in violent altercations in the children's presence," and mother's mental and emotional problems.

In March 2022, father was "irritated and upset" about mother's extramarital affairs.

At the adjudication hearing on April 5, 2022, the juvenile court sustained the petition as to the counts related to the parents' violent altercations, but dismissed the count based on mother's mental and emotional problems, noting that the hospitalization "appears [to have been] a one-time episode," and "the children report feeling safe with mother."

In May 2022, father reported being "worried about [mother's] mental health" because she is acting "weird," "talking to herself, making weird comments to the children," and doing "'strange' things like putting a pool with water on top [of] a bed."

---

[2] All statutory references are to the Welfare and Institutions Code.

4

Father reported mother was "not changing baby Marvin's diaper," "has not showered in days," and "is not meeting the children['s] basic needs." When father asks her "why she is acting this way," mother "does not respond."

By June 2022, Angel, Ashley, and Angela had begun weekly therapy sessions, and the therapist reported "no concerns" about the children. Mother was attending monthly therapy sessions. Father had enrolled in a domestic violence program for batterers.

At the July 2022 disposition hearing, the court ordered reunification services for mother and father, including domestic violence support group, parenting, and individual counseling for mother, and a 52-week domestic violence class, parenting classes, and individual counseling for father. The Department requested that the court include anger management classes in father's case plan, which the court declined to do. The court released Angel, Ashley, and Angela to mother and father. After finding another man, G.P., to be Marvin's biological father, the court granted G.P. monitored visitation with Marvin and continued the disposition as to that child.

In August 4, 2022, mother gave birth to Sharon. The social worker at the hospital did "not have any concern about mother's mental health, ability to take care of the newborn[,] or mother's physical health." The social worker reported mother "is bonding appropriately with newborn and . . . is attentive to [the] newborn['s] needs." Father and mother were arguing frequently about mother's infidelity. Angel, Ashley, and Angela reported that mother was caring for Sharon, with father's help.

On August 29, 2022, father "reported he wants to separate from mother as he cannot continue living with someone who was unfaithful." Father expressed doubt as to whether he was

Sharon's father and requested a DNA test. Father also stated that "he is willing to move in with mother so he can save money."

In September 2022, father reported that the family planned to move out of their current home, and that he was not planning on living with them but would help them financially. Father reported "he cooks for the children, does the laundry, cleans the house[,] and drives the children to school." He denied any ongoing domestic violence or arguments with mother.

**B. Section 300 Petition for Baby Sharon**

On September 9, 2022, the Department filed a petition asking the juvenile court to exert jurisdiction over Sharon under section 300, subdivisions (a), (b), and (j), based on mother and father's history of engaging in violent altercations in the children's presence.

At the September 2022 initial hearing concerning Sharon, the juvenile court ordered a DNA test for father and released Sharon to father and mother.

In October 2022, G.P. and his wife reported that Marvin had a scratch on his face and that his feet were peeling and blistered. The same month, father showed the family's preservation worker a video in which Sharon was under the crib face down, explaining that he had found the baby like that while mother was in the bathroom. The worker reported this to the Department, and also reported that mother looked "absent during the [family's] sessions[,] has a blank stare," and is "not able to answer basic questions like how many children she has." Mother reported that father kicked her and the children out of the home on October 13, 2022, and that they were staying with family.

On October 17, 2022, the Department spoke with father, who reported that he arrived home one day and asked mother to help him clean the house, and that mother got upset and left with the children. Father reported that mother "does[n't] clean, cook, or [properly] care for the children." The Department spoke with Ashley and Angela the same day, who reported that father had arrived home and told mother and the children they had to leave the house. Father was screaming at mother and threw a baby bottle at mother's leg as she fed Sharon on the bed. Mother was also interviewed by the Department while she was staying with Sharon at a motel. She reported that father had yelled at her and the children to leave the home, but did not physically abuse anyone. She reported that Angel was taking the bus to school, and Angela and Ashley an Uber. The Department observed "a very bad diaper rash" on Sharon when mother changed her diaper.

On October 27, 2022, father told the Department that he picked mother and the children up from the motel after Ashley texted him asking to return home because mother was acting "bizarre." Ashley told father that mother was talking to herself, staring at walls, and not feeding the children. When father went to the motel, he asked mother to feed Sharon, but she refused. Father woke Ashley up to make Sharon a bottle, but Sharon would not take the bottle. After two or three hours, Ashley forced mother to breastfeed Sharon by placing Sharon on mother.

In late October, the Department visited the family at the home, and asked mother why she had not gone to the Mission Rescue Shelter. Mother responded that she called and was told there were no beds available. The Department reminded mother that her application had been accepted and that the shelter had

told the Department "that the family could arrive at any time." The Department observed Sharon cry nonstop for 25 minutes without mother attending to her. The Department asked mother to feed Sharon, and mother responded that she did not have enough milk yet. Father explained that Sharon "cries a lot," and mother "just lets her cry." Father explained "he needs to go to work to pay bills and he cannot stay at the house . . . to supervise" mother. Father reported feeling remorse for sending the children out of the home, and stated that he cares about the children and was worried about mother's mental condition. He expressed willingness to continue paying rent until mother found a shelter or affordable housing.

On November 4, 2022, the juvenile court granted the Department's removal request, ordering the children removed from mother and father's custody.

On November 8, 2022, the children were removed from the family home. Angel was placed with maternal grandmother; Ashley and Angela with a nonrelative caretaker; Marvin with his biological father; and Sharon with another nonrelative caretaker. Angel reported not wanting to go to foster care, and Ashley stated her desire to remain with father, despite not feeling safe with mother.

**C. Subsequent Petitions Under Sections 387 and 342**

On November 10, 2022, the Department filed a petition under section 387 on behalf of Angel, Ashley, and Angela, alleging that mother failed to comply with the juvenile court's orders that she participate actively in individual counseling and family preservation services and enroll in a domestic violence support group. The Department also filed a section 342 petition on behalf of Angel, Ashley, Angela, and Marvin, alleging that

8

father threw a baby bottle at mother's leg in October and parents continued to engage in verbal altercations; that mother has mental and emotional problems, had been talking to herself, and failed to provide food for the children; father knew of mother's problems and failed to protect the children from mother; Marvin had been left alone without supervision for extended periods of time; and both parents left Sharon alone for extended periods, resulting in Sharon being found face down under a crib.

At the detention hearing on November 14, 2022, counsel for minors requested that the children be released to father with a safety plan, including "frequent and unannounced home visits and that mother not be in the home." Counsel urged that "Angela and Ashley . . . do feel safe with their father," and "want to live with him." The Department opposed the release of the children to father, arguing that father "engaged in further violence by throwing a bottle at the mother" while mother held Sharon, and that he "engaged in threatening speech," when he said that mother had better leave the home because he did not know what he was capable of. The juvenile court made "a prima facie finding to detain the children from both parents," noting that although "the children feel safe with their father," "it appears [he] is unable to control his behavior."

On November 16, 2022, the Department filed an amended section 300 petition as to Sharon, containing an additional count based on mother's "mental and emotional problems," which "render[ her] unable to provide regular care for" Sharon.

**D. Adjudication and Disposition on Subsequent Petitions**

On January 19, 2023, the juvenile court convened the jurisdiction and disposition hearing. It found that G.P. was the

9

presumed father for Marvin.  The court sustained the counts in the section 342 petition, except for those based on allegations that mother and father had left Marvin unattended for extended periods of time.  The court also sustained the 387 petition, which was based on mother's failure to enroll in domestic violence and her failure to attend mental health appointments.  Finally, the court sustained the amended section 300 petition (which concerned Sharon).

The court removed the children from both parents, ordering Angel, Ashley, Angel, and Sharon suitably placed, and releasing Marvin to G.P.  The court reasoned that removal "is appropriate and necessary" because "there is a risk that there is still going to be further domestic violence" given that mother and father "are still living together."  The court ordered reunification services, including "anger management," based on the court's mistaken understanding "that that was a prior order of the court."  The juvenile court ordered monitored visitation for parents, including monitored visits between father and Marvin.

Counsel for minors noted that the children are suitably placed—Angel with maternal grandmother, Angela and Ashley in a foster home, and Sharon in a different foster home.  Counsel then requested that the Department "place all of the children together preferably with the maternal grandmother," and the court schedule a two-month follow-up hearing regarding placement.  The Department agreed that the children should be placed together, but opposed a hearing and instead requested that the court "order a CFT about this so we can sit down and talk about who is going to go where."  The court scheduled a progress hearing for March 23, 2023.

Father filed a timely notice of appeal.

10

On July 20, 2023, the juvenile court held the six-month review hearing, at which it continued jurisdiction over Angel, Ashley, Angela, and Sharon; found "by clear and convincing evidence that return of the child[ren] to the physical custody" of mother and father "would create a substantial risk of detriment to the child"; found that parents' progress towards "alleviating or mitigating the causes necessitating placement" had been substantial for father and not so for mother; and continued reunification services for both parents.[3]

On January 18, 2024, the juvenile court convened the 12-month review hearing, at which it continued jurisdiction over Angel, Angela, Ashley, and Sharon, and again found returning the children to parental custody would be detrimental to the children's wellbeing.

## DISCUSSION

Father argues that insufficient evidence supports the juvenile court's removal orders at the detention and disposition hearings, and that the juvenile court abused its discretion in ordering father to take anger management classes.

## I.  Father's Challenge to the Detention Orders is Moot

We agree with the Department that father's appeal is moot with respect to the detention orders because "those orders were superseded by the disposition orders and there is no effectual relief" that can be provided.  (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1088, fn. 7.)  Accordingly, father's appeal is dismissed as to his challenges to the detention orders.

---

[3]     We grant the Department's request for judicial notice of the juvenile court's July 2023 and January 2024 minute orders.

## II. Dispositional Orders

### A. Substantial Evidence Supports the Orders Removing Sharon, Angel, Ashley, and Angela from Father's Custody

A juvenile court may not remove a child from the custody of his parents unless it "finds by clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if [he or she] were returned home, and there are no reasonable means by which the [child's] physical health can be protected without removing" him or her from the parents' custody.  (§ 361, subd. (c)(1).)  The requirement of clear and convincing evidence shows the """"bias of the controlling statute is on family preservation, not removal.""""  (*In re S.F.* (2023) 91 Cal.App.5th 696, 720; see also *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 ["The elevated burden of proof for removal . . . at the disposition stage reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so"].)[4]

"We review a dispositional order removing a child from a parent for substantial evidence, '"keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence."'"  (*In re M.V.* (2022) 78 Cal.App.5th 944, 960 (*M.V.*).)  "'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.'"  (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 146.)

---

[4]     Father's observation that the focus of the removal statute is family preservation is well taken.

Here, the juvenile court removed the children from father's custody because the evidence showed he had multiple violent outbursts against mother in the children's presence, including throwing a baby bottle at mother while she was feeding Sharon— an incident which occurred after the commencement of these dependency proceedings. Although father and mother's marital problems had escalated into violence, they continued to live together, despite mother's option to seek housing in a domestic violence shelter. Moreover, father stated that he planned to move out and still help support mother and children financially but did not do so. Instead, father kicked both mother and children out of the home, which undermines father's position that children could be safe in his custody so long as the Department assisted the parents with living separately. While the children were not themselves physically injured, the juvenile court could reasonably find that they were at substantial risk of harm due to the parents' domestic violence and that there was no reasonable means by which they could be protected without removal. (See, e.g., *In re T.V.* (2013) 217 Cal.App.4th 126, 136-137.)

Father argues that the record does not show "'reasonable efforts'" by the Department to ameliorate the risk by separating the parents so that the parents' domestic violence and mother's mental health issues no longer posed a risk of substantial danger to the children. (See *M.V., supra,* 78 Cal.App.5th at p. 964 [the Department has a duty to make "'reasonable efforts'" "'to prevent or eliminate removal'"].) We disagree. The Department gave mother domestic shelter information and connected her to a shelter that was willing to accept her, but mother refused to go. While perhaps the Department could have done more to facilitate mother and father living separately, "reasonable efforts, like

13

reasonable services, need only be reasonable under the circumstances, not perfect." (*In re H.E.* (2008) 169 Cal.App.4th 710, 725.)

## III. The Juvenile Court Did Not Exercise its Informed Discretion When it Ordered Anger Management

"'[A] discretionary order based on the application of improper criteria or incorrect legal assumptions is *not* an exercise of *informed* discretion and is subject to reversal even though there may be substantial evidence to support that order. [Citations.] If the record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit [it] to exercise *informed* discretion . . . .'" (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal.App.5th 299, 334, quoting *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15-16.)

Although substantial evidence would otherwise support the juvenile court's order that father attend anger management, the record affirmatively shows that the court based its decision to include anger management on its misunderstanding that it had previously ordered him to participate in anger management. (The court was misled by the Department's erroneous statement to that effect.) In fact, the court had specifically declined the Department's recommendation to order father to anger management at the prior hearing. Because the court's decision was based on an erroneous assumption, it did not properly exercise its discretion. We therefore remand to give it the opportunity to do so.

14

## DISPOSITION

The dispositional orders are affirmed as to the children's removal, but reversed as to the requirement that father attend anger management.


LEE, J.*

WE CONCUR:



BAKER, Acting P. J.



KIM, J.

---

*     Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.